IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| Abdullah Abriq, on behalf of himself and all others similarly situated,<br><br>  Plaintiff,<br>v.<br><br>DARON HALL, in his official capacity as Sheriff of Davidson County; and the METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY,<br><br>  Defendants. | Case No. |

## VERIFIED COMPLAINT

1. The Plaintiff, Abdullah Abriz (OCA # 562161) ("Plaintiff"), acting by and through undersigned counsel, bring this Verified Complaint against the Metropolitan Government of Nashville and Davidson County ("Metro Nashville"), acting by and through and the Davidson County Sheriff's Office ("DCSO") and Davidson County Sheriff Daron Hall, in his official capacity as Sheriff of Davidson County ("Sheriff Hall") (collectively, "Defendants"). The Defendants are detaining the Plaintiff in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

## PRELIMINARY STATEMENT

2. This is an action for declaratory and injunctive relief. The Plaintiff are immigrants to the United States who are being held illegally by the Defendants in violation of the United States Constitution. For the past five years, the Defendants have illegally used Davidson County facilities to detain at least detain hundred, and likely thousands, of immigrants in return for monetary payments from the U.S. Department of Homeland Security Immigration and

Customs Enforcement ("ICE"). The Defendants' unlawful seizure of ICE administrative detainees is unconstitutional and poses serious and continuing harms to the detainees. The Defendants' conduct also flouts the will of the Metro Council and the citizens of Metro Nashville whom they represent. The Defendants draw their authority from the Metro Charter and the will of the people of Davidson County. The Defendants had no power to seize these Plaintiff in the first place. They have no power to hold them now.

## THE PARTIES

3. Plaintiff is a foreign national who immigrated to the United States under a F-1 student visa.

4. Plaintiff has never been arrested or convicted of any crime.

5. On April 6, 2017, ICE took custody of the Plaintiff pending civil removal proceedings.

6. On April 6, 2017, ICE transferred custody of the Plaintiff to the Defendants at the Davidson County Jail location on Harding Place in Nashville, Tennessee.

7. Plaintiff is currently in the custody of the Defendants.

8. Sheriff Hall is the duly elected Sheriff of Davidson County. Sheriff assumed first became Sheriff in 2002 and has served in that role since that time. Among other duties, under Tenn. Code Ann. § 8-8-201(3) and Charter § 16.05, Sheriff Hall authority to "[t]ake charge and custody of the jail . .. and of the prisoners therein[,]" and to "receive those lawfully committed, and keep them personally . . . until discharged by law." The Plaintiff bring suit against Sheriff Hall in his official capacity only.

9. Defendant Metro Nashville is an incorporated, legal subdivision of the State of Tennessee. Metro Nashville is governed a by Mayor and a Metro Council, subject to the organic

document enabling its creation – the Metro Charter – as well as the Tennessee Constitution and Tennessee statutory law.

## JURISDICTION AND VENUE

10. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 1983. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because (1) Defendant has their official residences in this district; (2) a substantial part of the events or omissions giving rise to the claims occurred in this district; and (3) Defendant is subject to the Court's personal jurisdiction because Defendants are a municipal corporation that is located within this district and/or live and reside in this jurisdiction.

## FACTUAL ALLEGATIONS

### I. The Defendants' Limited Power to Enter into Contracts

11. Under Tenn. Code Ann. § 12-9-104, a political subdivision of the State (such as Metro Nashville) can lonely enter into a contract if its "governing bod[y]" takes "appropriate action" "by resolution or otherwise pursuant to law."

12. The Tennessee Code also contains a statute provision specific to contracts with the federal government relating to enforcement of federal immigration laws. Tenn. Code Ann. 50-1-101 states as follows:

> For purposes of enforcing immigration laws, . . . the legislative body of a municipality or county, or the chief law enforcement officer of the county upon approval by the governing legislative body, may enter into a written agreement, in accordance with federal law, between the municipality or county and the United States Department of Homeland Security concerning the enforcement of federal immigration laws, detention and removals, and investigations in the municipality or county.

13. The Charter of the Metropolitan Government of Nashville and Davidson County, Tennessee (the "Charter") sets out and delineates the power of Metro Nashville.

14. Under § 2.01(37) of the Charter, Metro Nashville has the authority "[t]o enter into contracts and agreements with other governmental entities . . . with respect to furnishing by or to others services and the payments to be made therefor."

15. Under § 3.01 of the Charter, Metro Nashville's legislative authority to utilize the power to enter intro contracts (among other powers) is vested in the metropolitan city council ("the "Metro Council").

16. Under § 3.05 of the Charter and under the Rules of Procedure of the Council of the Metropolitan Government of Nashville and Davidson County, the Metro Council "legislates" by issuing ordinances or resolutions.

17. Under Tennessee statutory law and the Charter, Metro Nashville can only enter into a contract with ICE through legislation duly approved by the Metro Council.

18. Under Tennessee statutory law (Tenn. Code Ann. § 50-1-101), any contract between Metro Nashville and ICE must be in writing.

19. Under § 8.603 of the Charter, the Metropolitan Attorney of Metro Nashville (the "Metropolitan Attorney" must "[p]repare or approve all contracts . . . in writing in which the metropolitan government is concerned."

20. Thus, before Metro Nashville can contract with ICE with respect to enforcement of federal immigration laws, in including detention, the Metro Council must approve execution of the contract through appropriate legislation and the Metropolitan Attorney must also approve it.

21. Furthermore, under Council Rule 16, Charter § 8.103(e), and Metro Code § 2.24.020, no resolution or ordinance that involves or requires the appropriation or expenditure of money may be voted upon unless the Director of Metro Nashville's Department of Finance

(the "Director of Finance") provides written certification approving the measure as to availability of funds.

22. In past agreements with federal governmental entities, Metro Nashville has treated funds obtained from the federal government as money that must be "appropriated" to a particular department with prior approval from the Director of Finance.

23. Upon information and belief, Metro Nashville therefore cannot, or least would not, contract with ICE without obtaining approval from the Director of Finance.

24. Finally, upon information and belief, it is the regular practice of the Metro Council not to approve contracts without approval from the Director of Insurance.

25. Upon information and belief, Metro Nashville cannot, or at least would not, contract with ICE without obtaining approval from the Director of Insurance.

II. **The INA, ICE, and the Delegation of ICE Functions**

26. The Immigration and Nationality, 8 U.S.C. § 1101 *et seq.* ("INA"), establishes a comprehensive federal scheme that defines the conditions under which immigrants to the United States may be removed from the county.

27. It is not a crime for a removable alien to be present in the United States. Accordingly, removal proceedings are a civil matter, not a criminal one.

28. ICE is a sub-agency of the U.S. Department of Homeland Security.

29. Among other responsibilities, ICE has the authority to perform pre-custody law enforcement functions prior to taking custody of an individual as set forth in INA § 287(a).

30. Under INA § 287(g), ICE can enter into in a written agreement with state, local, or private entities that authorizes non-federal officials to perform pre-custodial immigration functions. These types of contracts are often referred to "287(g) agreements."

31. ICE has also has the authority to perform certain post-custody functions, including detaining immigrants for civil immigration violations that subject them to removal and holding individuals during the "removal period" from the date of a removal order to the date of actual deportation. Individuals held on these grounds are not charged with a crime; instead, they are civil "administrative detainees" of ICE.

32. ICE detains hundreds of thousands of aliens per year, many for prolonged periods of time. ICE possesses only a small fraction of the necessary bed space to perform its immigration detention function. Accordingly, ICE enters into written contracts with states, localities, or private facilities to house administrative detainees.

### III. Metro Nashville's Now-Expired Contracts with ICE

33. Between 2007 and 2012, Metro Nashville contracted with ICE to perform pre-custodial law enforcement functions and post-custodial immigration detention functions for IC.

34. In February 2007, at Sheriff Hall's recommendation, the Council issued Resolution No. RS2007-1763, which authorized the DCSO to enter into a § 287(g) agreement ( "Initial § 287(g) Agreement). In October 2009, the Council issued Resolution No. RS2009-997, which authorized the DCSO to enter into a superseding § 287(g) agreement with ICE. ("§ 287(g) Agreement"). In August 2007, the Council issued Resolution No. RS2007-223, which approved the execution of an inter-governmental service agreement between the DCSO for the detention and care of administrative detainees (the "2007-2012 IGSA").

35. Each of these three agreements (the Initial § 287(g) Agreement, the § 287(g) Agreement, and the 2007-2012 IGSA") contains one or more pages reflecting authorization for Sheriff to execute each agreement, including approval from the Director Finance, the Director of Insurance, and the Metropolitan Attorney.

36. The Defendants could not legally have entered into the Initial § 287(g) Agreement, the § 287(g) Agreement, or the 2007-2012 IGSA without prior authorization from the Metro Council and approval from the Metropolitan Attorney. Upon information and belief, the Defendants also required approval from the Director of Finance and the Director of Insurance before Sheriff Hall could execute any of those three agreements.

37. Under ¶ XXI of the § 287(g) Agreement, that agreement was set to expire in August 2012. Similarly, under ¶ VIII.A of the 2007-2012 IGSA, that agreement was also set to expire by August 2012.

38. Under the 2007-2012 IGSA, the DSCO agreed to take custody of "Administrative Detainees" of ICE in return for payment of $61.00 per day for each detainee. (¶¶ I.A and I.C.) Payments were to be made upon receipt of an executed version of the agreement by an "authorized" local government official. (¶ II.A.) The 2007-2012 IGSA contains provisions related to the safety and care of inmates, such provisions relating to medical care, housing, and interpreter services. (¶ III.) It also contains provisions protecting Metro Nashville from liability under certain circumstances, such as where ICE causes injury to persons or property for negligent acts or omissions that would lead to liability under the Federal Tort Claims Act. (¶ XIV.A.)

### IV. Controversy Concerning Metro Nashville's Contractual Relationship with ICE

39. ICE's delegation of pre-custodial law enforcement functions and post-custodial immigration detention functions proved to be controversial both nationally and locally.

40. For example, with respect to Metro Nashville's § 287(g) Agreement, a pregnant Nashville resident named Juana Villegas was detained by local law enforcement officials under the 287(g) agreement and was forced to give birth while shackled to a Metro General Hospital

bed. This incident achieved national publicity and led to a lawsuit against Metro Nashville. Also, in *Renteria-Villegas v. Metropolitan Government of Nashville & Davidson County*, multiple Plaintiff challenged the Sheriff's authority to even be a party to a § 287(g) agreement.

41. ICE's delegation of post-custodial functions has also been controversial. It has been reported that immigration detention contracts can be financially beneficial for operators of state or local jails, who can supplement cash-strapped budges by pocketing the differential between the *per diem* rate and the marginal cost of housing an administrative detainee. Similarly, the explosion in the number of administrative detainees and the use of non-federal facilities has led to numerous reports of abuse, such as verbal, physical, and sexual abuse, poor diet and health facilities, and the use of solitary confinement.

42. Amidst this firestorm of controversy, the Metro Council allowed both the § 287(g) Agreement and the 2007-2012 IGSA to expire in 2012.

43. Accordingly, in August 2012, Sheriff Hall publicly announced that Metro Nashville would not renew the § 287(g) Agreement, effective October 8, 2012 – the last date stated in the § 287(g) Agreement. The § 287(g) Agreement expired by its terms on October 8, 2012.

44. As to the 2007-2012 IGSA, it expired by its terms in 2012. The Metro Council did not authorize Sheriff Hall or the DCSO to renew that contract, nor is there any public of approval from the Director of Finance, the Director of Insurance, or the Metropolitan Attorney to do so. Similarly, the Metro Council did not to authorize Sheriff Hall or the DCSO to execute any further agreement with ICE to take custody of Administrative Detainees, nor is there any public of approval from the Director of Finance, the Director of Insurance, or the Metropolitan Attorney to do so.

45. Under Tennessee law, Metro Nashville's Charter, and the Metro Council's rules, the DCSO's detention of Administrative Detainees should have ceased immediately as of August 2012.

## V. Acting *Ultra Vires* and at the Direction of Sheriff Hall, the DCSO Illegally Continues to Take Custody of ICE Administrative Detainees

46. Notwithstanding the expiration of the 2007-2012 IGSA, the DCSO – at Sheriff Hall's direction – has continued to hold Administrative Detainees and to collect money from the federal government for doing so.

47. The DCSO has no lawful authority to hold Administrative Detainees. Metro Nashville has not duly authorized an agreement with the federal government to do so. The Director of Insurance, the Metropolitan Attorney, and the Director of Finance have not approved this arrangement. Under Tennessee law, Metro Nashville's Charter, and Metro Council's rules, the Defendants' authorization to contract with ICE for post-custody functions ended in 2012.

48. Under Tennessee law and Metro Nashville's Charter, the Defendants are acting outside the law, and doing so openly.

49. Since August 2012, the DCSO has continued to take custody of Administrative Detainees without lawful authority. The Plaintiff are Administrative Detainees of ICE who, at Sheriff Hall's direction, are being held illegally by the Defendants pending removal proceedings.

50. Upon information and belief, the Defendants have taken custody of, and detained, thousands of Administrative Detainees over the past five years. This reflects an ongoing custom, policy, and practice of the DCSO to take custody of Administrative Detainees illegally for ICE in return for cash payments, despite actual knowledge that no lawfully approved IGSA has been in place since 2012.

51. Sheriff Hall is aware of this issue but has refused to stop it. To the contrary, the DCSO is acting at the direction of Sheriff Hall in this illegal course of conduct.

52. The DCSO's unlawful detention of ICE Administrative Detainees poses serious and continuing harms to detainees.

   a. The fact that the Defendants are implementing an unconstitutional policy and practice necessarily constitutes actionable harm.

   b. Furthermore, in contrast to the strict contractual standards for the safety and care of detainees set forth in the 2007-2012 IGSA, currently there no contractually enforceable provisions protecting Administrative Detainees from mistreatment.

   c. Metro Nashville is also at risk because, among other things, it is unclear whether ICE would be required to indemnify Metro Nashville against liability for misconduct attributable to ICE.

   d. Finally, the Defendants' conduct violates Metro Nashville's originating Charter, defies the will of the Metro Council, and flouts the wishes of the people of Davidson County.

53. Absent declaratory and injunctive relief, this custom, police, or practice will continue.

## CAUSES OF ACTION

### COUNT I:
### Fourth Amendment Violation of the Right to be Free from Unlawful Searches and Seizures, Actionable Under 42 U.S.C. § 1983

54. Plaintiff reallege, restate, and incorporate by reference the allegations made in the preceding paragraphs.

55. Section 1983 provides a private right of action for the violation of a constitutional right by a person acting under color of state law.

56. Both Sheriff Hall and Metro Nashville are "persons" acting "under color of state law" for purposes of § 1983. The Plaintiff' allegations relate exclusively to Sheriff Hall's

official role. Sheriff Hall has only those duties prescribed to him by state and local law, including the authority to "[t]ake charge and custody of the jail . . . and of the prisoners therein[,]" and to "receive those lawfully committed, and keep them personally . . . until discharged by law." Tenn. Code Ann. § Tenn. Code Ann. § 8-8-201(3) and Charter § 16.05. Sheriff Hall is not a signatory to any agreement with ICE for the time period after August 2012. However, in his role as Sheriff, he directed – and continues to direct – the DSCO to take custody of ICE Administrative Detainees after the 2007-2012 IGSA expired. Therefore, at all relevant times, Sheriff Hall was acting – and continues to act – under color of state law by virtue of his official position as the Sheriff. Because the Plaintiff are suing Sheriff in his official capacity, the lawsuit is treated as a suit against Metro Nashville, which is a "person" for purposes of a § 1983 injunctive relief claim. The same holds true with the respect to the DCSO, which is a division of Metro Nashville.

57. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable seizures, shall be violated[.]" The Plaintiff holds this Fourth Amendment right to be from unconstitutional searches and seizures.

58. When the Defendants took custody of the Plaintiff, they seized him within the Fourth Amendment.

59. A duly authorized contract with ICE is the only means by which the Defendants can handle immigration detention functions otherwise reserved to the federal government. Thus, the Defendants only had authority to take seize the Plaintiff if a duly authorized contract with ICE allowed them to do so.

60. As explained above, there is no lawfully executed agreement in place between ICE and Metro Nashville. Under Tennessee statutory law and Metro Nashville's Charter, the

DCSO has no independent power to contract with the federal government absent proper authorization. Thus, the DCSO's current arrangement with ICE is unlawful, *ultra vires*, and of no legal force. Accordingly, the Defendants had no duly authorized contractual right to seize the Plaintiff and have no right to continue to detain them.

61. The Defendants' seizure of the Plaintiff therefore violates the Plaintiff's right to be free from an unconstitutional search and seizure.

62. Hundreds, likely thousands, of other Administrative Detainees have also been held by the Defendants in violation of the United Constitution on the same grounds.

63. A pattern, policy, and custom of the Defendants is the moving force behind the Fourth Amendment violations at issue. Since August 2012, Sheriff Hall and the DCSO have detained Administrative Detainees without authorization from the Metro Council and without a duly executed IGSA. Under Tennessee and local law, the Defendants have no independent authority to contract with ICE to hold Administrative Detainees in return for monetary payments. Sheriff Hall exercises supervisory responsibility over the DCSO and exercises final decision-making authority in directing the DCSO to continue to take custody of Administrative Detainees without authorization from the Metro Council and without written approval the from the Metropolitan Attorney, the Director of Finance, and the Director of Insurance. Sheriff Hall has also acquiesced in the unlawful seizures of the Plaintiff and other Administrative Detainees during this time frame. The Defendants' unlawful seizure of the Plaintiff is no isolated accident: it is the product of policy or custom of violating the constitutional rights of Administrative Detainees for the last five years.

64. Similarly, the DCSO also has an established policy or custom of taking custody of Administrative Detainees without lawful authority from the Metro Council to do so. That policy and custom is the moving force behind the constitutional violations at issue.

65. Under 42 U.S.C. § 1983, Plaintiff is entitled to injunctive relief that prohibits that Defendants from continuing to detain the Plaintiff in violation of the Fourth Amendment.

66. Under 42 U.S.C. § 1983, Plaintiff is entitled to declaratory relief that the Defendants have violated his Fourth Amendment rights.

## COUNT II:

## Violation of the Fourteenth Amendment Guarantee of Due Process, Actionable Under 42 U.S.C. § 1983

67. Plaintiff reallege, restate, and incorporate by reference the allegations made in the preceding paragraphs.

68. The concept of substantive due process forbids the government from depriving a person of life, liberty, or property in such a way that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.

69. The Plaintiff has a liberty in the Freedom from physical restraint or confinement in the absence of lawful authority.

70. The Defendants' seizure and detention of the Plaintiff constitutes a significant deprivation of liberty that requires due process protection.

71. In August 2012, the DCSO lost the authority to detain Administrative Detainees for ICE. Nevertheless, without a requisite written agreement under Tenn. Code Ann. § 50-1-101 and outside the powers granted them by the Charter, the DCSO is holding the Plaintiff in custody under the auspices of the DCSO or Metro Nashville. The Plaintiff's continued detention therefore violates a core, constitutionally protected liberty interest.

72. The Constitutional deprivations at issue are, at a minimum, the product of deliberate indifference by the Defendants. The Defendants have been unlawfully detaining Administrative Detainees for the past five years. They know that there is no IGSA in place. And they know from firsthand experience that they cannot contract with ICE to detain Administrative Detainees without authorization from the Metro Council and approval from the relevant department heads. Indeed, the Defendants were signatories both to the 2007-2012 IGSA and the § 287(g) Agreement, and they are aware that both expired. Thus, the incidents at issue are not the product of mere negligence, but are part of a conscious decision by the Defendants.

73. Under the totality of the circumstances, the Defendants' conduct shocks the conscience and reflects an arbitrary abuse of government power. The will of the people of Metro Nashville, expressed through their elected representatives on the Metro Council, is that the DCSO's authority to hold Administrative Detainees and collect fees for their detention expired in August 2012. As noted, the Defendants know that the 2007-2012 IGSA expired, was never renewed, and reflects a policy that the elected representatives of Metro Nashville chose to abandon in the face of public outcry. In the midst of these issues are actual people – the Administrative Detainees – who are unlawfully being held against their will in a local jail without any written contractual standards in place to protect them. Their lives cannot be held hostage to an unauthorized handshake agreement between the Defendants and whoever at the federal government is funding this arrangement.

74. For the same reasons set forth above, a pattern, policy, and custom of the Defendants is the moving force behind the Fourteenth Amendment violations at issue.

75. Under 42 U.S.C. § 1983, Plaintiff is entitled to injunctive relief that prohibits that Defendants from continuing to detain the Plaintiff in violation of the Fourteenth Amendment.

76. Under 42 U.S.C. § 1983, Plaintiff is entitled to declaratory relief that the Defendants have violated his Fourteenth Amendment rights.

## PRAYER FOR RELIEF

WHEREFORE, respectfully request that the Court:

a. That service of process be had upon Defendants and that Defendants be required to appear and answer this complaint within the time prescribed by law;

b. Temporarily and permanently enjoin the Defendants from enforcing continuing to detain Administrative Detainees without lawful authority;

c. Declare that the Defendants' actions are unconstitutional under the Fourth and Fourteenth Amendments to the United States Constitution;

d. Award Plaintiff nominal damages for the deprivation of his constitutional rights;

e. Grant Plaintiff litigation expenses, costs of suit, and reasonable attorney's fees as provided by law, including but not limited to, pursuant to 42 U.S.C. § 1988; and

f. Grant to Plaintiff such other or further relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

Dated: April 7, 2017

Respectfully submitted,

**/s/ Anthony A. Orlandi**
J. Gerard Stranch, IV, Esq. (BPR #23045)
Tricia Herzfeld (BPR # 26014)
Anthony A. Orlandi (BPR # 33988)
BRANSTETTER, STRANCH & JENNINGS, PLLC
223 Rosa L Parks Avenue, Suite 200
Nashville, TN 37203
Phone: (615) 254-8801
Fax: (615) 255-5419
triciah@bsjfirm.com
aorlandi@bsjfirm.com

*Attorneys for Plaintiff*

Elliot Ozment  
Ozment Law  
1214 Murfreesboro Pike  
Nashville, TN 37217  
(615) 321-8888  
Elliott@ozmentlaw.com

# VERIFICATION

The undersigned, _Abdulkh Mansour Abriq_ are informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

Executed this 7th day of April, 2017.

