**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| Abdullah Abriq, on behalf of himself and all others similarly situated, ) ) ) | Case No. |
| Plaintiff, ) | |
| v. ) | |
| DARON HALL, in his official capacity as Sheriff of Davidson County; and the METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, ) ) ) ) ) | |
| Defendants. ) | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

Under Fed. R. Civ. P. 65, the Plaintiff, Abdullah Abriq ("Plaintiff"), on behalf of himself and all others similarly situated, hereby submit this Memorandum in Support of their Motion for a Temporary Restraining Order against the Metropolitan Government of Nashville and Davidson County ("Metro Nashville"), acting by through and through the Davidson County Sheriff's Office ("DCSO"), and Davidson County Sheriff Daron Hall ("Sheriff Hall") (collectively, the "Defendants"). The Defendants are detaining the Plaintiff in violation of the United States Constitution, and immediate injunctive relief is required to remedy those violations.[1]

**INTRODUCTION**

The Plaintiff is an immigrant to the United States who is being held illegally by the Defendants in violation of the United States Constitution. He is not alone. For the past five years, the Defendants have illegally used Davidson County facilities to detain hundreds (likely thousands) of immigrants in return for monetary payments from the U.S. Department of

---

[1] The Motion and this Memorandum rely upon the Verified Complaint (the "Verified Complaint") and the accompanying Declaration of Anthony A. Orlandi ("Orlandi Declaration").

Homeland Security Immigration and Customs Enforcement ("ICE"). In 2012, following multiple federal lawsuits and a firestorm of public criticism, the Metropolitan Council of Metro Nashville (the "Metro Council") elected to allow Metro Nashville's controversial contractual relationship with ICE to expire. Under Tennessee law and Metro Nashville's originating charter (the "Metro Charter"), this decision deprived the Defendants of authority to contract with ICE after 2012. Nevertheless, without consent from the Metro Council, the Defendants illegally have continued to take custody of ICE administrative detainees in return for monetary payments from the federal government. The Defendants' unlawful seizure of ICE administrative detainees is unconstitutional and poses serious and continuing harms to the detainees. It also places Metro Nashville at risk of monetary liability for misconduct by ICE. Perhaps most importantly, the Defendants' conduct flouts the will of the Metro Council and the citizens of Metro Nashville whom they represent. The Defendants draw their authority from the Metro Charter and the will of the people of Davidson County. The Defendants had no power to seize this Plaintiff in the first place. They have no power to hold him now.

Administrative detainees of ICE have a Fourth Amendment right to be free from unlawful seizures. They also have a substantive Fourteenth Amendment right not to be deprived of liberty without due process of law. The Defendants' actions violate both of those core constitutional rights. The Defendants are acting *ultra vires*, they have done so for years, and they will continue to do so unless and until this Court stops them. The Plaintiff therefore requires immediate injunctive relief to release them and other unlawfully detained immigrants from the custody of Sheriff Hall and the DCSO. The U.S. Constitution requires no less.

## BACKGROUND

### I. The INA, ICE, and the Delegation of ICE Functions

2

## A. The INA

It is not a crime for a removable alien to be present in the United States.[2]  For that reason, removal proceedings are a civil matter, not a criminal one.[3]  The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, establishes a comprehensive federal scheme that, *inter alia*, defines the conditions under which immigrants to the United States may be removed from the country.[4]  Removal proceedings do not always result in removal: the government typically has the burden of proof to show by "clear and convincing evidence" that deportation is warranted.[5]  In many removal cases, individuals are ultimately allowed to remain in the United States for a variety of reasons, including where the government fails to meets its burden or the government grants defensive immigration relief.[6]

## B. ICE Pre-Custodial and Post-Custodial Functions

The U.S. Immigrant and Customs Enforcement Office of Detention and Removal ("ICE") is a sub-agency of the U.S. Department of Homeland Security.

Among other responsibilities, ICE has the authority to perform law enforcement functions prior to taking custody of an individual.  These pre-custody functions include, *inter alia*, the right to conduct warrantless interrogations of individuals suspected of being an "alien"

---

[2] *See Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012); *see also Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012) ("unauthorized presence in the United States is not a crime.").
[3] *Arizona*, 132 S. Ct. at 2499 ("Removal is a civil, not criminal, matter"); *see also Abpikar v. Lompoc Fed. Bureau of Prisons*, 2012 U.S. Dist. LEXIS 124634, at *5 (C.D. Cal. July 16, 2012) (citing *Ramirez-Osorio v. Immigration & Naturalization Serv.*, 745 F.2d 937 (5th Cir. 1984)).
[4] *Buquer v. City of Indianapolis*, 797 F. Supp. 2d 905, 910 (S.D. Ind. 2011); *see* 8 U.S.C. § 1227 (INA § 237) (defining grounds for removal).
[5] INA § 240(3)(A).
[6] *See* **Exhibit A** to Orlandi Decl., U.S. DOJ Review Statistics Excerpt.

3

in the United States in violation of the INA, making civil arrests, administering oaths, and preparing affidavits for ICE supervisory review.[7]

ICE also has exclusive authority to perform post-custody functions, including (a) detaining aliens for civil immigration violations that subject them to removal,[8] and (b) holding individuals during the "removal period" from the date of a removal order to the date of actual deportation.[9]  For example, ICE can maintain custody of individuals subject to removal until an immigration judge or another federal court issues a final order adjudicating whether the alien should be removed.[10]  These individuals are not charged with a crime; instead, they are civil "administrative detainees" of ICE (hereinafter, "administrative detainees").

### C.  Section 287(g) Agreements Relative to Pre-Custodial Functions

Under INA § 287(g), ICE has authority to enter into written agreements with states, localities, or private companies that authorize non-federal officials to perform pre-custodial ICE immigration enforcement functions (set forth in § 287(a)) that are otherwise reserved for federal officers.[11]  These arrangements have generated serious controversy and spawned litigation concerning abuses of power by deputized state or local officials.[12]

---

[7] INA § 287(a).

[8] *See* 8 U.S.C. § 1103(a); INA § 236(a); *see also* 8 U.S.C. §§ 1225, 1226, 1226(a) (specifying grounds for detention pending removal determination); *Renteria-Villegas v. Metro. Gov't*, 382 S.W.3d 318, 321 (Tenn. 2012) (discussing Nashville § 287(g) agreement).

[9] *See, e.g., Sanchez-Soriano v. United States*, 2011 U.S. Dist. LEXIS 146977, at *5-6 (N.D. Ill. Aug. 2, 2011).

[10] 8 U.S.C. § 1226(a) (INA § 236(a)).  In some circumstances, the federal government has taken the position that certain individuals can be removed through expedited proceedings without the need for further action by an immigration judge.  That distinction is immaterial here.

[11] 8 U.S.C. § 1357(g); *Renteria-Villegas v. Metro. Gov't*, 796 F. Supp. 2d 900, 902 (M.D. Tenn. 2011); *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 972 (D. Ariz. 2011) ("Local law enforcement officers . . . do not have 'inherent authority' to investigate civil immigration violations[.]") (citing *U.S. v. Arizona*, 641 F.3d 339, 362 (9th Cir. 2011).

[12] *See, e.g., U.S. v. Johnson*, 28 F. Supp. 3d 499 (M.D.N.C. 2014) (lawsuit against sheriff's office for discrimination and unconstitutional searches and seizures); *Melendres v. Arpaio*, 989 F.

4

### D. IGSAs Relative to Post-Custodial Functions

ICE detains hundreds of thousands of aliens per year.[13]  Although the length of detention can vary, many detainees are subject to prolonged detention of six months or more with little to no recourse.[14]  ICE possesses only a small fraction of the bed space necessary to house so many people for such long periods of time.  Therefore, it enters into written contracts with states, localities, or private facilities to house administrative detainees while removal proceedings are pending.[15]  A contract of this type between ICE and state or local entity is commonly styled as an "inter-governmental service agreement," or "IGSA".[16]

Although the precise terms of each IGSA can vary, the basic premise is that ICE pays a state or locality money – typically in the form of a *per diem* rate per detainee – to house an administrative detainee until further notice.[17]  According to independent reports, this arrangement can be financially beneficial for operators of state or local jails, who can supplement their budgets by pocketing the differential between the *per diem* rate and the

---

Supp. 2d 822, 825 (D. Ariz. 2013) (stating that ICE trained sheriff's employees to consider "race or 'Mexican ancestry'" in making decisions); *Renteria-Villegas*, 796 F. Supp. 2d 900 (lawsuit alleging that DCSO and Sheriff Hall's actions violated plaintiffs' constitutional rights); *Villegas v. Metropolitan Government of Nashville*, 709 F.3d 563 (lawsuit against DCSO for forcing plaintiff to give birth while shackled to a bed and denying her access to her newborn child and a breast pump).

[13] *See* **Exhibit B** to Orlandi Decl., ice.gov printout (reflecting removals of between 240,000 and 410,100 aliens per year from 2008 to 2016).

[14] *See, e.g., Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) (upholding grant of preliminary injunction against prolonged immigration detention in violation of the Due Process Clause).

[15] *See, e.g., Nat'l Immigrant Justice Ctr. v. U.S. Dep't of Homeland Security*, 2015 U.S. Dist. LEXIS 11520, at *3 (N.D. Ill. Feb. 2, 2015).  In some instances, the local government in turn subcontracts the immigration detention function to a private company.  *See, e.g., Doe v. Neveleff*, 2013 U.S. Dist. LEXIS 17640 (W.D. Tex. Feb. 8, 2013) (describing relationship among ICE, a county government in Texas, and private prison subcontractor). As described herein, it appears that the DCSO at least purported to do that here.

[16] Incidentally, an IGSA can refer to agreements between any governmental entities.

[17] Under its FOIA obligations, ICE maintains a publicly available website that contains copies of IGSAs into which it has entered.  *See* https://www.ice.gov/foia/library.

marginal cost of housing an administrative detainee.[18] There are inherent moral hazards created by the commodification of immigration detention for state and local governments and private detention facilities.[19] Furthermore, the explosion in the number of administrative detainees and the use of non-federal facilities has led to numerous reports of abuse, such as verbal, physical, and sexual abuse, poor diet and health facilities, and the use of solitary confinement.[20]

### E. Metro Nashville's Temporary, and Now Expired, IGSA and Separate § 287(g) Agreements with ICE

As with many other localities nationwide, Metro Nashville temporarily contracted with ICE to perform some of its functions. Specifically as explained in this section, from 2007 to 2012, Metro Nashville entered into concurrent (but distinct) § 287(g) Agreements for pre-custodial functions and an IGSA for post-custodial functions. Both nationally and locally, these programs generated a firestorm of controversy.[21] Metro Nashville chose not to renew these contracts. Thus, the DCSO has no authority to detain immigrants post-custody.

### A. State and Local Laws Governing the DSCO's Execution of Inter-Government Contracts

The State of Tennessee does not grant its political subdivisions *carte blanche* to enter into contracts with other governmental entities. Instead, under Tenn. Code Ann. § 12-9-104, political subdivisions of the State (including Metro Nashville) can only enter into contracts with another

---

[18] *See, e.g*, **Exhibit D** to Orlandi Decl., National Immigrant Justice Center ("NIJC") August 2015 Report (finding that "local governments seek to maximize profits from the detection space they rent to ICE. At some facilities, such profit motives have resulted in cost-cutting on a range of basic needs for immigrants, such as medical care…food, and hygiene products[.]")

[19] *See* **Exhibit E** to Orlandi Decl., Sept. 15, 2016 *High Country News* Article.

[20] *See* **Exhibit G** to Orlandi Decl., ACLU (detailing sexual abuse complaints by state in immigration detention system since 2007, including Tennessee-based complaints); **Exhibit H** to Orlandi Decl., National Immigrant Justice Center and Physicians for Human Rights report (describing abusive confinement of administrative detainees in "punitive and long-term confinement without meaningful avenues for appeal").

[21] *See* collective **Exhibit I** to Orlandi Decl. (reports regarding § 287(g) program abuses).

6

public entity if its "governing bod[y]" takes "appropriate action" "by resolution or otherwise pursuant to law." In other words, before Metro Nashville can contract (directly or through its departments) with any other governmental entity, its "governing body" must issue a "resolution" or otherwise authorize the action "pursuant to law." Tennessee concerns specific statutory provision, Tenn. Code Ann. § 50-1-101, relating to contracts with the federal government relating to federal immigration functions:

> For purposes of enforcing immigration laws, . . . *the legislative body of a municipality or county*, or the chief law enforcement officer of the county *upon approval by the governing legislative body*, may enter into a *written agreement*, in accordance with federal law, between the municipality or county and the United States department of homeland security concerning the enforcement of federal immigration laws, detention and removals, and investigations in the municipality or county.[22]

Thus, Tennessee law requires that (1) process inheres in any contractual arrangement between a political subdivision of the State of Tennessee and any other governmental entity, and (2) any agreement with the U.S. Department of Homeland Security (of which ICE is a subdivision) relating to immigration detention be *in writing with approval from the local governing body*.

The Charter of the Metropolitan Government of Nashville and Davidson County, Tennessee (the "Charter") sets out and delineates the power of Metro Nashville.[23] That power includes the authority "[t]o enter into contracts and agreements with other governmental entities . . . with respect to furnishing by or to others services and the payments to be made therefor."[24] The Charter provides that Metro Nashville's legislative authority to perform that function (among others) is vested in the metropolitan city council ("the "Metro Council"), which is

---

[22] Tenn. Code Ann. § 50-1-101 (emphases added).
[23] Relevant excerpts from the Charter are attached as collective **Exhibit J to Orlandi Decl.** hereto.
[24] **Exhibit J to Orlandi Decl.,** Charter § 2.01(37).

7

comprised of 40 elected representatives.[25] The Metro Council "legislates" by issuing ordinances or resolutions.[26] In this fashion, consistent with Tenn. Code Ann. § 12-9-104 and § 50-101 relative to federal immigration-related contracts, the Charter requires that Metro Nashville enter into contracts only through legislation. Under the Charter, Metro Nashville otherwise has no power to enter into contracts.

Under the Metro Council's Rules, there are strict rules governing the introduction, consideration, and passage of ordinances and resolutions by the Metro Council. For example, to introduce legislation, a member (or members) of the Metro Council must introduce a proposed ordinance or resolution, an original copy of which must be signed and transmitted to the Metropolitan Clerk's Office. Furthermore, the Council may not consider any ordinance or resolution that is introduced outside the appropriate time frame.[27] No action may be taken on any ordinance or resolution unless a "sponsor" of the legislation is present or has designated a proxy in writing.[28] All hearings of the Council are public.[29]

Under the terms of the Charter, Metro Nashville's legal department, acting through the "metropolitan attorney" (hereinafter, the "Metropolitan Attorney"), must "[p]repare or approve all contracts . . . in writing in which the metropolitan government is concerned."[30] In addition, no resolution or ordinance that involves or requires the appropriation or expenditure of money may be voted upon unless the Director of Metro Nashville's Department of Finance (hereinafter,

---

[25] **Exhibit J to Orlandi Decl.,** Charter §§ 3.01 and 3.06.
[26] **Exhibit J to Orlandi Decl.,** Charter 3.05; *see also* **Exhibit K** to Orlandi Decl., 2015-19 Rules of Procedure of the Council of the Metropolitan Government of Nashville and Davidson County ("Council Rules").
[27] Council Rule 11.
[28] Council Rule No. 29.
[29] **Exhibit J to Orlandi Decl.,** Charter § 3.04; *see also* **Exhibit L** to Orlandi Decl., Metro Code § 2.04.020; Council Rule 1.
[30] **Exhibit J to Orlandi Decl.,** Charter §§ 8.602(e) and 8.603.

the "Director of Finance") provides written certification approving the measure as to the availability of funds.[31]  Furthermore, it also appears to be the Metro Council's regular practice not to approve contracts without the approval for the Director of Insurance as to insurance. Thus, Council legislation is necessary, but not sufficient, to authorize execution of a contract.

As a result of this mosaic of requirements, Metro Nashville has a thorough, highly public, mandatory process for executing contracts.

### B.  Application of Metro Nashville Procedures

For decades, Metro Nashville has routinely applied the aforementioned procedures to authorize or modify contracts with other governmental entities, including the federal government.  Attached as **Exhibit M** hereto is a collective exhibit containing examples of agreements between or among Metro Nashville's constituent departments (the DCSO, the Electric Power Board of Nashville, the Mayor's Office of Emergency Management, the Metro Board of Health, and the Metro Department Parks and Recreation) and various federal agencies or subdivisions (such as the Drug Enforcement Administration, the Department of Homeland Security, the Bureau of Alcohol, Tobacco, and Firearms, the U.S. Army Corps of Engineers, the U.S. Coast Guard, the Environmental Protection Agency, and the U.S. Navy).

Sheriff Hall was a signatory to some of the agreements authorized by resolution or ordinance in Exhibit M, including an IGSA and two § 287(g) agreements with ICE as described herein.  In intergovernmental agreements with the federal government involving the receipt of

---

[31] Council Rule 16 ("No resolution or ordinance involving or requiring the appropriation or expenditure of money, upon being filed, shall be placed upon the agenda . . . until the Director of Finance has furnished a statement as to the availability of funds[.]"); *see also* **Exhibit J to Orlandi Decl.,** Charter 8.103(e) (describing powers and obligations of the Director of Finance, including the authority to "examine all contracts, purchase orders and other documents which would result in or involve financial obligations against the metropolitan government"); Metro Code § 2.24.020.

Case 3:17-cv-00690   Document 4   Filed 04/07/17   Page 9 of 27 PageID #: 374

funds by Metro Nashville, certain contracts treat the "funds obtained" as money to be "appropriated" to a particular department (such as the MNPD).[32]

Metro Nashville and its constituent departments (including the DCSO) plainly know the proper process for executing or modifying contracts with federal entities, including IGSAs. Tennessee law, the Charter, and the Council's Rules mandate this process as a prerequisite to the lawful execution of contracts with other governmental entities. With one glaring exception that gives rise to this lawsuit, Metro Nashville and the DCSO have followed it.

**C. The Now-Expired Agreements Between the DCSO and ICE.**

1. The Execution of Agreements with ICE from 2007 to 2012.

Daron Hall became the Sheriff of Davidson County in 2002 and has served in that role since that time. In February 2007, at Sheriff Hall's recommendation, the Council issued a resolution authorizing the Davidson County Sheriff's Office ("DCSO") to enter into a § 287(g) agreement with ICE (the "Initial 287(g) Agreement").[33] The Initial § 287(g) Agreement (styled as a "Memorandum of Understanding"), was executed by Sheriff Hall in January 2007 with explicit written approval from the Director of Finance, the Director of Insurance, and the Metropolitan Attorney.[34]

In August 2007, soon after authorizing the Initial 287(g) Agreement, the Council issued a resolution approving the execution of an IGSA between the DCSO and ICE for the "detention and care of administrative detainees."[35] By its terms, that agreement related only to ***post-custody ICE functions*** and was to expire no later than August 2012. That IGSA is attached as **Exhibit O** hereto and will be referred to herein as the "2007-2012 IGSA."

---

[32] *See, e.g*, Resolution No. RS2011-1797.
[33] *See* **Exhibit N** to Orlandi Decl., Resolution No. RS2007-1763.
[34] *See* **Exhibit P** to Orlandi Decl., Initial § 287(g) Memorandum of Agreement.
[35] *See* **Exhibit Q** to Orlandi Decl., Resolution No. RS2007-2123.

In October 2009, the Council issued a resolution authorizing the Davidson County Sheriff's Office ("DCSO") to enter into another 287(g) agreement with ICE, which by its terms would expire by August 2012 and related only to ***pre-custody ICE functions*** (the "§ 287(g) Agreement").[36] Consistent with approved procedures, the publicly available version of the contract, styled as a "Memorandum of Agreement," contains a page reflecting approval of the Council to execute the agreement, including signatures from the Metropolitan Clerk, the Director of Finance, the Director of Insurance, and the Metropolitan Attorney.[37]

Sheriff Hall recommended all three agreements. In compliance with Tennessee law and local laws and procedures, he signed them only after receiving appropriate authorization through a resolution of the Metro Council with written approval from the Director of Finance, the Director of Insurance, and the Metropolitan Attorney.

Indeed, in *Renteria-Villegas*, the Tennessee Supreme Court has already addressed the chain of authority under which Sheriff Hall lawfully can execute contracts. There, the Tennessee Supreme Court identified Tenn. Code Ann. § 50-1-101(a) as providing state authorization to execute contracts with ICE (subject to approval by the "local governing body"), and noted that the § 287(g) Agreement was valid because "***Metro authorized the Sheriff to execute the agreement on Metro's behalf***."[38] In holding that Sheriff Hall had authority to contract with ICE, the Tennessee Supreme Court looked to § 18.17 of the Charter, which provides that the "mayor and council of the metropolitan government shall have the power to and authority to participate in, cooperate in and take all necessary action with respect to any and all projects, programs and

---

[36] *See* **Exhibit R** to Orlandi Decl., Resolution No. RS2009-997; *Renteria*, 382 S.W.3d at 322 (citing Resolution No. RS2009-997); *see also* **Exhibit S** hereto, § 287(g) Agreement. The agreement by its terms lasted only for three years. (Ex. R, ¶ XXI.)

[37] Ex. R at pp. 11 and 22. In a signature page (page 11), Sheriff Hall executed the agreement, thereby acknowledging that he was "fully authorized to enter into" the MOA.

[38] 382 S.W.3d 318 at 322 n.4 (emphasis added).

Case 3:17-cv-00690   Document 4   Filed 04/07/17   Page 11 of 27 PageID #: 376

undertaking of any nature whatsoever authorized by any statute, rule, or regulation of the United States . . . or any federal or state agency."[39]  The same reasoning applies to the 2007-2012 IGSA.

    2.  Terms of the 2007-2012 IGSA.

The 2007-2012 IGSA applies only to "Administrative Detainees" of ICE, who "are not charged with criminal violations and are only held in custody to assure their presence throughout the administrative hearing process and to assure their presence for removal from the United States pursuant to a lawful order by the Immigration Court . . . ."  (I.A.).  Under the IGSA, the DCSO agreed to take custody of ICE Administrative Detainees in return for payment of $61.00 per day for each detainee.  (I.C.)  Payments were only to be made upon receipt of an executed version of the agreement by an "authorized" local government official.  (II.A.)

Article III of the IGSA provided safeguards for the care of Administrative Detainees by the DCSO, including (1) providing "safekeeping, housing, subsistence, and medical" services, along with "compliance with all applicable law, regulations, fire and safety codes, policies and procedures" (III.A),[40] (2) a contractual obligation to treat Administrative Detainees the same as other inmates held by the DCSO and not to house Administrative Detainees with adult detainees. (*Id.*); (3) making "special provisions" for non-English speaking, disabled, or illiterate detainees. (*Id.* at III.D); and (4) providing "necessary escort and transportation services" for court hearings using at least two qualified sworn law enforcement officers.  (*Id.* at III.E.)[41]

---

[39] *Id.* at 323.

[40]  In particular, the IGSA contains detailed procedures relating to medical services for Administrative Detainees, such as the assurance of on-site medical care through appropriately licensed health care services personnel designated by Metro Nashville (VI.B) and the availability of emergency medical care at all times (VI.H).

[41] The agreement also gave ICE the right to conduct unannounced inspections to ensure acceptable conditions of confinement.  (IX.A.)  ICE retained the right to terminate the agreement for failure to pass an inspection.  (IX.B.)

12

The agreement also contained certain provisions to protect Metro Nashville from potential liability. This includes a "hold harmless" provision that indemnified Metro Nashville "against any and all liability claims and costs . . . for injury to or death of any person(s), or loss or damage to any property, which occurs in connection with or is incident to performance of work under the terms of this Agreement, and which results from the negligent acts or omission of ICE officers or employees, to the extent that ICE would be liable for such negligent acts or omissions under the [FTCA]."

The agreement specified that, in compliance with the Metro Code, *it would remain in effect for no more than 60 months*. (VIII.A.) The terms of the 2007-2012 IGSA could be altered only through a mutually agreed modification *in writing* by an "ICE Contracting Officer" and an "*authorized signatory*" of Metro Nashville. (Art. X.A.) The final page of the document reflects authorization for Sheriff Hall to execute the agreement, including approval from the Director of Finance, the Director of Insurance, and the Metropolitan Attorney. (*Id.*)

        3.   Summary of the Applicable Procedures

As this sequence of events indicates, Sheriff Hall and the DCSO understood the appropriate procedures to follow before entering into an agreement with ICE. The DCSO signed separate, legally distinct agreements with ICE related to pre-custody functions (the § 287(g) agreements) and post-custody functions (the 2007-2012 IGSA), respectfully. Furthermore, the Defendants plainly understood – as they should have under applicable law – that both the 2009-2012 § 287(g) Agreement and the 2007-2012 IGSA would expire in August 2012 absent further legislation from the Metro Council and appropriate approvals from the Metropolitan Attorney, the Director of Insurance, and the Director of Finance.

**D.  August 2012 Expiration of Metro Nashville's 287(g) Agreement and the 2007-2012 IGSA.**

13

By their terms, the § 287(g) Agreement and the 2007-2012 IGSA were set to expire in August 2012.  The programs proved to be controversial.  Amidst the controversy, the Metro Council allowed those contracts to expire and did not renew them.

In a highly publicized incident, a pregnant Nashville resident named Juana Villegas was detained by local law enforcement officials under the 287(g) agreement and was forced to give birth while shackled to a Metro General Hospital bed.[42]  Additionally, local law enforcement's exercise of immigrant authority generated public criticism more generally.[43]  Also, multiple plaintiffs filed a federal lawsuit challenging the authority of the Sheriff even to be a party to a § 287(g) agreements.[44]

Against this backdrop, Sheriff Hall announced in August 2012 that Metro Nashville would not renew its participation in the § 287(g) program, effective October 8, 2012 – the last day specified in the § 287(g) agreement.[45]  In making this announcement, Sheriff Hall and Metro Nashville publicly reinforced that (1) the written agreement with ICE governed the DCSO's authority to perform pre-custody ICE functions, and (2) that the DCSO could not continue to perform those functions after October 8, 2012 (under the agreement's terms) absent authorization from Metro Nashville, and (3) that Metro Nashville would not be providing that authorization, thereby allowing the program to expire.

On August 6, 2012, by its terms, the 2007-2012 IGSA expired.[46]  The Metro Council did not renew that agreement.  There is no public record of any ordinance or resolution extending the

---

[42] *See Villegas v. Metro Gov't of Nashville*, 709 F.3d 563 (6th Cir. 2013).
[43] *See* Ex. I.
[44] *See Renteria-Villegas v. Metro Gov't*, 382 S.W.3d 318 (Tenn. 2012).
[45] **Exhibit T** to Orlandi Decl., WSMV.com Article.
[46] Sheriff Hall did not make a corresponding public announcement concerning the 2007-2012 IGSA under which the DSCO had been performing post-custodial functions for ICE.

14

IGSA beyond August 2012.  Nor is there public record of approval from the Director of Finance, the Metropolitan Attorney, and the Director of Insurance to continue that program.  Given the public criticism of Metro Nashville's relationship to ICE, this is not surprising.  ***Accordingly, effective August 6, 2012, the DCSO no longer had lawful authority to continue holding Administrative Detainees***.  The 2007-2012 IGSA was dead letter.  The DCSO's detention of prisoners in return for $61 per prisoner per day should have ceased immediately under Tennessee law, Metro Nashville's Charter, and the Metro Council's Rules.

### F.  Acting *Ultra Vires*, the DCSO Continues to Take Custody of ICE Administrative Detainees

Notwithstanding the expiration of the 2007-2012 IGSA, the DCSO – at Sheriff Hall's direction – has continued to hold Administrative Detainees and to collect money from the federal government for doing so.  Indeed, in a recent article, the *Tennessean* reported that the sheriff's office continues to "house inmates for ICE" under an "agreement with ICE."[47]  But while the fact of those detentions is true, the basis for it is not.  The DCSO has no lawful authority to hold Administrative Detainees.  Metro Nashville has not duly authorized an agreement with the federal government to do so.  The Director of Insurance, the Metropolitan Attorney, and the Director of Finance have not approved this arrangement.  Under Tennessee law and Metro Nashville's Charter, the Defendants are acting *ultra vires*, and doing so openly.

The DCSO's unlawful detention of ICE Administrative Detainees posses serious and continuing harms to detainees.  As explained, herein, the fact that the Defendants are implementing an unconstitutional policy and practice necessarily constitutes actionable harm.  Furthermore, in contrast to the strict contractual standards for the safety and care of detainees set

---

[47] **Exhibit U** to Orlandi Decl., Tennessean.com article, "Why Nashville is not a sanctuary city, and what that means." (published March 16, 2017).

forth in the 2007-2012 IGSA, currently there no contractually enforceable provisions protecting Administrative Detainees from mistreatment. Metro Nashville is also at risk because, among other things, it is unclear whether ICE would be required to indemnify Metro Nashville against liability for misconduct attributable to ICE. Finally, and perhaps most importantly, the Defendants conduct violates Metro Nashville's originating Charter, defies the will of the Metro Council, and flouts the wishes of the people of Davidson County.

### G. The Plaintiff's Complaint

The Plaintiff is an Administrative Detainees of ICE who, at Sheriff Hall's direction, are being held illegally by the DCSO at the Davidson County Jail pending removal proceedings.

The Plaintiff is not alone. Since August 2012, the DCSO has continued to hold Administrative Detainees at the Davidson County Jail without lawful authority. Upon information and belief, the DCSO has detained thousands of Administrative Detainees over the past five years. This reflects an ongoing custom, policy, and practice of the DCSO to take custody of Administrative Detainees for ICE in return for cash payments, despite actual knowledge that no lawfully approved IGSA has been in place since August 2012. Sheriff Hall is aware of this issue but has refused to stop. Absent declaratory and injunctive relief, this custom, police, or practice will continue.

Based on these allegations, the Plaintiff asserts claims under § 1983 against Sheriff Hall (in his official capacity) and the DCSO. They claim that the Defendants have violated (1) their Fourth Amendment right to be free from unlawful searches and seizures; and (2) their substantive right under the Due Process Clause of the Fourteenth Amendment to be free from the deprivation of life, liberty, or property without due process of law. They request a declaration that the Defendants' practices violate the U.S Constitution. Pertinent to this Motion, they also

16

demand an immediate injunction against the continued enforcement of the Defendants' unconstitutional practices.

**RULE 65 STANDARD**

A temporary restraining order depends on four factors: (1) the moving party's likelihood of success on the merits; (2) the threat of irreparable injury to the moving party; (3) the threat that the injunction will cause substantial harm to others; and (4) the public interest.[48] These are factors to be balanced, not individual prerequisites.[49]

**I.      The Plaintiff is Likely to Prevail on their Fourth and Fourteenth Amendment Claims that the Defendants Have Detained Them Without Lawful Authority.**

Section 1983 provides a private right of action for the violation of a constitutional right by a person acting under color of state law.[50] To prove a § 1983 official capacity claim seeking only declaratory and injunctive relief, a plaintiff must establish that: (1) the defendant deprived the plaintiff of a right secured by the U.S. Constitution; (2) the deprivation was caused by a "person" acting under color of state law; and (3) a policy, practice, or custom of that "person" played a part in the violation of federal law.[51] With respect to the third element, a plaintiff must show that the governmental entity was the "moving force" behind the constitutional violation.[52]

All of these elements are satisfied here.

---

[48] *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 460 (6th Cir. 1999); *see also ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015), *cert. denied*, 84 U.S.L.W. 3476 (U.S. Feb. 29, 2016) (No. 15-836).

[49] *Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006).

[50] *City of St. Louis v. Prapotnik*, 485 U.S. 112, 121 (1988).

[51] *Kentucky v. Graham*, 473 U.S. 159 (1985); *see also Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1993) (official capacity claims requires plaintiff to show an "officially executed policy or the toleration of a custom" that caused the constitutional violation).

[52] *Dressman v. Metro Gov't of Nashville & Davidson Cnty.*, 2012 U.S. Dist. LEXIS 167640, at *41 (M.D. Tenn. Nov. 27, 2012) ("[T]he traditional definition of acting by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.")

17

## A. Both Sheriff Hall and Metro Nashville are "Persons" acting "Under Color of State Law"

Sheriff Hall is the duly elected Sheriff of Davidson County.[53]  Under the Charter, among other duties, the Sheriff has custody and control of the metropolitan jail.[54]  Under Tenn. Code Ann. § 8-8-201, which is incorporated by reference in Charter § 16.05, Sheriff Hall has authority to "[t]ake charge and custody of the jail . . . and of the prisoners therein[,]" and to "receive those lawfully committed, and keep them personally . . . until discharged by law."[55]  Although the Sheriff is a constitutional officer,[56] his duties are prescribed by statute.[57]

The Plaintiff's allegations relate exclusively to Sheriff Hall's official role.  Sheriff Hall is not a signatory to any agreement with ICE for the time period after August 2012.  Therefore, at all relevant times, Sheriff Hall was acting – and continues to act – under color of state law by virtue of his official position as the Sheriff.[58]  Because the Plaintiff is suing him in his official capacity, the lawsuit is treated as a suit against Metro Nashville, which is a "person" for purposes of a § 1983 injunctive relief claim.[59]

## B. The Plaintiff Has Been Deprived of His Fourth and Fourteenth Amendment Rights

1. <u>The Defendants Have Unlawfully Seized the Plaintiff in Violation of the Fourth Amendment</u>

---

[53] Charter § 16.05.

[54] *Id.*; *see also* Metro Code § 1.16.050.

[55] Tenn. Code Ann. § 8-8-201(3); *Renteria*, 382 S.W.3d at 321-22 (explaining that Charter § 16.05 incorporates the duties set forth in § 8-8-201).

[56] *Metro Gov't of Nashville & Davidson Cnty. v. Poe*, 215 Tenn. 53, 70 (Tenn. 1964).

[57] *Id.*

[58] *See Guzman-Martinez v. Corr. Corp. of Am.*, 2012 U.S. Dist. LEXIS 97356 (D. Ariz. July 13, 2012).

[59] *See Corlew v. Metro. Sheriff's Dept.*, 2016 U.S. Dist. LEXIS 57297, at *7-8 (M.D. Tenn. Apr. 6, 2016) (construing official capacity claims against Hall as claims against Metro Nashville); *see, e.g.*, *Bostic v. Biggs*, 2015 U.S. Dist. LEXIS 31901, at *20 (M.D. Tenn. Feb. 13, 2015) ("[I]t is the Metro Government that is the proper defendant when the complained-of actions are those of the DCSO.")

18

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable seizures, shall be violated[.]"[60] "A person is seized within the Fourth Amendment's meaning when an officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied."[61]

A "seizure" triggering Fourth Amendment protections occurs when a government actor has, by means of physical force or show of authority, in some way restrained the liberty of a citizen.[62] It is undisputed that pretrial detention constitutes a seizure within the meaning of the Fourth Amendment.[63] An administrative detainee of ICE is treated as a pretrial detainee.

When the Defendants took custody of the Plaintiff, they "seized" him under the Fourth Amendment. Although the Plaintiff was already in ICE's custody, the transfer constituted a new "seizure." The Defendants only had authority to take seize the Plaintiff if a duly authorized contract with ICE allowed them to do so.[64] Plainly, the Defendants lacked this authority.

As explained above, there is no lawfully executed agreement in place between ICE and Metro Nashville. Under Tennessee statutory law and Metro Nashville's Charter, the DCSO has

---

[60] U.S. Const. amend. IV.

[61] *Scozzari v. McGraw*, 500 App'x 421 (6th Cir. 2012) (quoting *United States v. Jones*, 674 F.3d 497, 501 (6th Cir. 2012)); *see also Desoto v. Bd. of Parks & Rec.*, 64 F. Supp. 3d 1070, 1098 (M.D. Tenn. 2014) (same).

[62] *Slusher v. Carson*, 540 F.3d 449, 454 (6th Cir. 2008).

[63] *Mercado v. Dallas Cnty.*, 2017 U.S. Dist. LEXIS 5785 (N.D. Tex. Jan. 17, 2017)

[64] Although in some jurisdictions it could be the case that a sheriff could hold a detainee based on probable cause to believe that a crime has been committed, the Plaintiff is unaware of any authority vested in the Sheriff to exercise police powers. Regardless, even if the Sheriff had this authority (which he does not), the Plaintiff is being held only as civil ICE Administrative Detainees. The Plaintiff is only in the DCSO's custody pursuant to their respective arrests by federal officials for alleged ***civil*** violations of the INA, not on the basis that there is probable cause to believe that they have committed a crime. The Plaintiff's continued warrantless detention without probable cause necessarily constitutes an unlawful seizure. *Miranda-Olivares v. Clackamas Cnty.*, 2014 U.S. Dist. LEXIS 50340, at *24 (D. Or. Apr. 11, 2014) (finding that continued detention of individual for ICE by county official acting without lawful authority and without probable cause constituted a "subsequent seizure").

Case 3:17-cv-00690   Document 4   Filed 04/07/17   Page 19 of 27 PageID #: 384

no independent power to contract with the federal government absent proper authorization. Thus, the DCSO's current arrangement with ICE is unlawful, *ultra vires*, and of no legal force. Accordingly, the Defendants had no duly authorized contractual right to seize the Plaintiff and have no right to continue to detain them in the Davidson County Jail. As with a § 287(g) agreement, a duly authorized IGSA with ICE is the only means by which the Defendants can handle immigration detention functions otherwise reserved to the federal government.[65]

### 2. The Plaintiff's Due Process rights have been violated.

"The concept of substantive due process forbids the government from depriving a person of life, liberty, or property in such a way that shocks the conscience or interferes with rights implicit in the concept of ordered liberty."[66] The plaintiff must articulate a protected liberty interest that has been violated.[67] In determining whether conduct that violated that liberty interest "shocks the conscience," courts examine the totality of the circumstances.[68] When a government official had a reasonable opportunity deliberate and consider alternatives to choosing a particular course of action, "their actions will be deemed conscience-shocking if they were taken with deliberate indifference towards the plaintiff's federally protected rights."[69]

In an analogous context, a district court framed the substantive due process inquiry as involving three questions: (1) whether the plaintiffs have asserted a liberty interest protected by the Due Process Clause; (2) whether the official actor's level of culpability offend the standards

---

[65] *See Buquer*, 979 F. Supp. 2d at 920 (finding it was unconstitutional for Indiana to authorize local officials to perform pre-custodial ICE functions without a § 287(g) agreement in place).

[66] *United States v. Salerno*, 481 U.S. 739, 746 (1987); *see also Gutzwiller v. Frank*, 860 F.3d 1317, 1328 (6th Cir. 1998).

[67] *Washington v. Glucksberg*, 521 U.S. 702 (1997).

[68] *Vanke v. Block*, 1998 U.S. Dist. LEXIS 23488, at *35 (C.D. Cal. Nov. 5, 1998) (citing *Cnty. of Sacramento v. Lewis*, 118 S. Ct. 1708, 1719 (1998)).

[69] *Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 134 (6th Cir. 2014) (quoting *Darrah v. City of Oak Park*, 255 F.3d 301) (6th Cir. 2001)).

of due process, reflecting deliberate indifference rather than mere negligence; and (3) whether the official's conduct shocks the conscience when taken in context.[70]  Here, the relevant factors are plainly satisfied.

First, there can be no dispute that the Plaintiff seeks to vindicate a protected liberty interest.  "Freedom from physical restraint or confinement in the absence of lawful authority 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.'"[71]  "It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."[72]  Accordingly, "[w]hen the government loses lawful authority to detain an individual, continued detention violates substantive due process."[73]  That is precisely the case here: the Plaintiff was seized and are being detained by the Defendants without lawful authority.  In August 2012, the DCSO lost the authority to detain Administrative Detainees for ICE.  Nevertheless, without a requisite written agreement under Tenn. Code Ann. § 50-1-101 and outside the powers granted them by the Charter, the DCSO is holding the Plaintiff in custody under the auspices of the DCSO or Metro Nashville.[74]  The Plaintiff's continued detention therefore violates a core, constitutionally protected liberty interest.[75]

---

[70] *Vanke*, 1998 U.S. Dist. LEXIS 23488, at *35-39 (citing *Cnty. of Sacramento v. Lewis*, 118 S. Ct. at 1719)

[71] *Vanke*, 1998 U.S. Dist. LEXIS 23488, at *39 (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)).

[72] *Foucha*, 504 U.S. at 80; *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment, from government custody, detention, or other forms of physical restraint, lies at the heart of the liberty that Clause protects.").

[73] *Vanke*, 1998 U.S. Dist. LEXIS 23788, at *40; *Uroza v. Salt Lake City*, 2014 U.S. Dist. LEXIS 127110, at *10-11 (D. Utah Sept. 10, 2014 ("P]hysical liberty deprivations can implicate due process concerns as well as Fourth Amendment concerns.")

[74] The Corrections Corporation of America ("CCA") operates the Metro-Davidson County Detention Facility ("MDCDF").  The Plaintiff is unaware of any IGSA between the MDCDF and ICE.  Indeed, a search of ICE's publicly available listing for IGSAs in Tennessee contains no

Second, the Constitutional deprivations at issue are, at a minimum, the product of deliberate indifference by the Defendants. The Defendants have been unlawfully detaining Administrative Detainees for the past five years. They know that there is no IGSA in place. And they know from firsthand experience that they cannot contract with ICE to detain Administrative Detainees without authorization from the Metro Council and approval from the relevant department heads. Indeed, the Defendants were signatories both to the 2007-2012 IGSA and the § 287(g) Agreement, and they are aware that both expired. Thus, the incidents at issue are not the product of mere negligence, but are part of a conscious decision by the Defendants.

Under the totality of the circumstances, the Defendants' conduct shocks the conscience and reflects an arbitrary abuse of government power. The will of the people of Metro Nashville, expressed through their elected representatives on the Metro Council, is that the DCSO's authority to hold Administrative Detainees and collect fees for their detention expired in August 2012. As noted, the Defendants know that the 2007-2012 IGSA expired, was never renewed, and reflects a policy that the elected representatives of Metro Nashville chose to abandon in the face of public outcry. In the midst of these issues are actual people – the Administrative Detainees – who are unlawfully being held against their will in a local jail without any written contractual standards in place to protect them. Their lives cannot be held hostage to an unauthorized handshake agreement between the Defendants and whoever at the federal government is funding this arrangement.

---

contracts with CCA in Tennessee. Accordingly, upon information and belief, the only source of authority for CCA to detain Administrative Detainees at MDCDF would be under a sub-contractual arrangement with either or both of the Defendants.

[75] Under the Due Process Clause of the Fifth Amendment, aliens are entitled to due process in deportation proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993).

**C. Sheriff Hall and Metro Nashville Policies Have Caused the Plaintiff and Other Administrative Detainees to Suffer Constitutional Rights Deprivations.**

A plaintiff can prove the existence of a policy or custom by showing (1) the municipality's legislative enactments or official agency policies; (2) actions by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.

Since August 2012, Sheriff Hall and the DCSO have detained Administrative Detainees without authorization from the Metro Council and without a duly executed IGSA. As the Plaintiff has explained, under Tennessee and local law, the Defendants have no independent authority to contract with ICE to hold Administrative Detainees in return for monetary payments. Sheriff Hall exercises supervisory responsibility over the DCSO and exercises final decision-making authority in directing the DCSO to continue to take custody of Administrative Detainees without authorization from the Metro Council and without written approval the from the Metropolitan Attorney, the Director of Finance, and the Director of Insurance. Sheriff Hall has also acquiesced in the unlawful seizures of the Plaintiff and other Administrative Detainees during this time frame. Similarly, the DCSO also has an established policy or custom of taking custody of Administrative Detainees without lawful authority from the Metro Council to do so.

The Defendants' policy or custom is the "moving force" behind the deprivation of the Plaintiff's rights under the Fourth and Fourteenth Amendments. The Defendants' unlawful seizure of the Plaintiff is no isolated accident: it is the product of policy or custom of violating the constitutional rights of Administrative Detainees for the last five years.

**II.     <u>The Threat of Irreparable Injury to the Moving Party</u>**

Absent immediate injunctive relief, the Plaintiff will suffer irreparable harm. When a deprivation of a constitutional rights is involved, courts generally hold that no further showing of irreparable harm is necessary.[76] That is because the loss of a constitutional right, even for a minimal period of time, unquestionably constitutes irreparable injury."[77] Thus, "when reviewing a motion for preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated."[78] More specifically, it is clearly established that detention without probable cause is an irreparable injury to a detainee.[79]

### III. Balance of the Equities

"[N]o substantial harm can be shown in the enjoinment of an unconstitutional policy."[80] Here, because the Plaintiff are reasonably likely to prevail on their constitutional claims, the balance of the equities necessarily favors the Plaintiff. The Defendants have no valid interest in enforcing an unconstitutional policy, nor can they equitably retain an interest in continuing to act *ultra vires* without the requisite written agreement with ICE as required by Tennessee statutory law (Tenn. Code Ann. § 50-1-101), the Charter, and Metro Council's Rules.

### IV. Public Interest

"It is always in the public interest to prevent the violation of a party's constitutional rights."[81] Thus, "[t]he public interest is promoted by the robust enforcement of constitutional

---

[76] *Rodriguez v. Providence Cnty. Cmty. Corr. Inc.*, 155 F. Supp. 3d 758 (M.D. Tenn. 2015) (citing 11A Miller, Fed. Prac. & Proc., § 2948.1 (3d ed. 1998)) (unauthorized detention caused irreparable harm for purposes of Rule 65 analysis).

[77] *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

[78] *Tanco v. Haslam*, 7 F. Supp. 3d 759, 769 (M.D. Tenn. 2012) (quoting *Bonnell v. Lorenzo*, 241 F.3d 800, 809) (6th Cir. 2001)).

[79] *Vanke*, 1998 U.S. Dist. LEXIS 23488, at *54 (citing *Gerstein*, 420 U.S. at 114).

[80] *Tanco*, 7 F. Supp. 3d at 770 (quoting *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2001)); *see also Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 274 F.3d 377, 400 (6th Cir. 2001).

[81] *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

rights."[82]   Here, because the Plaintiff is reasonably likely to prevail on their claims that the Defendants' conduct violates their Fourth and Fourteenth Amendment rights, the Court necessarily must hold that the public is served by immediate injunctive relief.  More broadly, immediate injunctive relief plainly serves the public interest.  In addition to protecting the Plaintiff himself – and others similarly situated – the citizens of Metro Nashville also have a strong interest in ensuring that the Defendants are not acting outside their lawful authorization from the Metro Council, beyond the powers afforded by the Charter, or against the policy preferences of the public as expressed through their elected Metro Council representatives.

## CONCLUSION

For the reasons set forth above, the Plaintiff respectfully requests that the Court grant the Motion and enter the proposed Temporary Restraining Order that requires the Defendants to relinquish custody of the Plaintiff and other unlawfully seized Administrative Detainees.

Dated: April 7, 2017                                Respectfully submitted,

**/s/ Anthony A. Orlandi**
J. Gerard Stranch, IV, Esq. (BPR #23045)
Tricia Herzfeld (BPR # 26014)
Anthony A. Orlandi (BPR # 33988)
BRANSTETTER, STRANCH &
JENNINGS, PLLC
223 Rosa L Parks Avenue, Suite 200
Nashville, TN 37203
Phone: (615) 254-8801
Fax: (615) 255-5419
gerards@bsjfirm.com
triciah@bsjfirm.com
aorlandi@bsjfirm.com

*Attorneys for Plaintiff*
Elliot Ozment
Ozment Law

---

[82] *Tanco*, 7 F. Supp. 3d at 771 (quoting *Am. Freedom Def. Initiative v. Suburban 15 Mobility for Reg'l Transp.*, 698 F. 3d 885, 896 (6th Cir. 2012)).

1214 Murfreesboro Pike
Nashville, TN 37217
(615) 321-8888
Elliott@ozmentlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 7, 2017, the foregoing document was served via hand delivery and email, as indicated, upon:

> John Cooper, Director of Law (via hand delivery)
> Lora Fox (via email at lora.fox@nashville.gov)
> Metropolitan Government of Nashville
> Department of Law
> Metro Courthouse, Suite 108
> P.O. Box 196300
> Nashville, TN 37219-6300

The below-identified counsel reasonably believes that the above-referenced counsel will represent one or all of the named defendants in this action.

**/s/ Anthony A. Orlandi**
Anthony A. Orlandi
